UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HAROLD E. CAMPBELL, JR.,

        Plaintiff,                5:05-CV-1501
                                                                         (NAM/GJD)

        v.

CONSOLIDATED RAIL CORPORATION AND
CSX TRANSPORTATION, INC.,

        Defendants.
_____

**APPEARANCES**                            **OF COUNSEL:**

Hannon & Palermo, P.C.              Gregory John Hannon, Esq.
Public Ledger Building, Suite 1000
150 South Independence Mall West
Philadephia, Pennsylvania 19106-3413
*Attorney for Plaintiff*

Hodgson Russ, L.L.P.                Noreen DeWire Grimmick, Esq.
677 Broadway, Suite 301              Lawrence R. Bailey, Jr.
Albany, New York 12207
and
Burns, White Law Firm               John B. Greenlee, Esq.
106 Isabella Street
Four Northshore Center
Pittsburgh, PA 15212
*Attorneys for Defendants*

**Norman A. Mordue, Chief U.S. District Judge**:

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

       Plaintiff was employed by the defendant railroad companies from 1975 to 2005 and has

sued pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, for

alleged work-related injuries. Defendants have moved for summary judgment on two grounds: 1)

plaintiff's claims for injuries to his hands and knees are barred by the FELA's three-year statute of limitations; and 2) the claim of repetitive-type trauma and injury to plaintiff's hands is barred by his acceptance of a previous settlement for work-related bi-lateral carpal tunnel syndrome. Plaintiff opposes defendants' motion.

## II.     FACTUAL BACKGROUND

The relevant facts in this case are as follows:  Plaintiff is a fifty-eight year old welder/foreman who began his railroad career at defendant Consolidated Rail Corporation in September 1976.  On June 1, 1999, he began working for defendant CSX.  As a welder/foreman, plaintiff's work consisted of 80% to 90% orgotherm or boutet welding.  Plaintiff spent the remaining 10% to 20% of his work time doing wire or stick welding.  Plaintiff believes that he exposed his hands to constant vibration by using a rail saw and grinders in his work.  He started having pain, numbness and tingling in his hands in 1983 which he attributed to his work on the railroad.  In 1995, plaintiff underwent bilateral carpal tunnel surgery.  He sued defendants for said injury to his hands and received a settlement in 1998.  As part of the settlement, plaintiff signed a full release of any and all past or future claims or medical treatment related to his bilateral carpal tunnel syndrome.

During an office visit with his primary care physician for a "CPE"[1] on May 4, 2001, plaintiff told Dr. James LaDolce that he had "concerns" regarding his hands, "particularly his right."[2]  Dr. LaDolce wrote that plaintiff said his hands "hurt" and that he "uses them all the time

---

[1] The Court presumes the abbreviation refers to "complete physical examination."

[2] The Court notes that said medical record is not in admissible form, *see* Fed. R. Civ. P. 56(e), since it is not certified or accompanied by an affidavit from Dr. LaDolce.  However, neither

- hammering, welding and grinding." In addition, Dr. LaDolce wrote that plaintiff complained of pain in his knees "when he bends a lot." According to Dr. LaDolce, plaintiff was "worried that he has bad arthritis."

Dr. LaDolce concluded in his notes that plaintiff suffered from "moderately advanced DJD of the right hand, MP joints of 2nd and 3rd fingers secondary to his work." In addition, Dr. LaDolce noted that plaintiff had "chronic knee pain secondary to bending with his work." There is no indication in the note of whether Dr. LaDolce discussed these findings or his diagnosis with plaintiff. In connection with his symptoms, Dr. LaDolce advised plaintiff to lose 20 pounds and "[s]tay active in terms of his hands."

Radiographic images taken of both of plaintiff's hands on May 4, 2001, revealed "advanced osteoarthritic change involving the MCP joints of the thumb, index and middle fingers with narrowing, sclerosis and marginal spurring" on the right. The radiologist also noted "[s]ubchondral cysts" in the heads of the second and third metacarpals and "mild osteoarthritic change at the DIP joints of the middle and ring fingers and at the PIP joints of the index and middle fingers." In plaintiff's left hand, the radiologist observed "osteoarthritic change at the MCP joints of the index and middle fingers, as well as the MCP joint fo the thumb. Osteoarthritic change is also present in the DIP joints of the middle and ring fingers. A subchondral cyst is present at the DIP joint of the ring finger." The "impression" noted on the radiologiy report is "bilateral osteoarthritis, most severe involving the MCP joints of the index and middle fingers, right greater than left." The radiologist also noted that x-rays of plaintiff's knees showed "very minimal osteoarthritis" based on the presence of "mild osteoarthritic changes spurring on the

---

party has raised an objection to the Court's consideration of it in the context of the present motion.

intercondylar eminences bilaterally." During a follow-up visit with plaintiff in July 2001, Dr. LaDolce made no mention of plaintiff's hands or knees.

In September 2003, plaintiff sought treatment for pain in his right knee from Dr. Glenn Axelrod, an orthopedic surgeon. Six weeks later, Dr. Axelrod performed surgery on plaintiff's right knee due to "degenerative changes and a lateral meniscus tear." Plaintiff had a second arthroscopic procedure performed on his right knee in June 2006. Plaintiff commenced the instant action in December 2004 alleging a work-related injury to both knees.

In April 2005, plaintiff saw Dr. George Mtanos, a rheumotologist, at the request of his then primary care physician, Dr. Robert Parke, a partner of Dr. LaDolce. In Dr. Mtanos' letter to Dr. Parke regarding the visit, Dr. Mtanos described plaintiff's history as follows:

> Harold was seen at your kind request on 4/22/05. As you know, he is a 56-year old pleasant white male whose symptoms started many years back with pain in the hands. He was given a diagnosis of carpal tunnel syndrome and he underwent surgery on both sides. However, over the years the symptoms have persisted and for the last three years they have been worse. He also started noticing progressive deformity in the hands. The hand pain is constant. it affects the knuckles mainly the MCP an[sic] PIP areas. He is quite stiff in the morning. He is unable to open his hand especially the left one. He has to make an effort to do it. the pain is aggravated by activity. . . . He also has been having knee pain on the right side for many years. He had undergone meniscal surgery by Dr. Axelrod whom he continues to see.

In April 2006, plaintiff filed an amended complaint in this action which added a claim for injuries to both hands and knees and/or aggravation of pre-existing injuries to his hands and knees.

### III. DISCUSSION

A.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive

4

law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325.

Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d Cir. 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d Cir. 243, 249 (2d Cir. 1985). It is with these considerations in mind that the Court addresses defendants' motion for summary judgment.

B.        Plaintiff's Failure to Comply with Local Rule 7.1

The Court first notes that plaintiff failed altogether to oppose defendants' Statement of Undisputed Material Facts pursuant to Local Rule 7.1(a)(3) or to file his own such statement. By opting not to submit proper papers in opposition to defendants' motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this District have not hesitated to enforce Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement. *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (listing cases); *see also*

5

*Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). Based thereupon, the Court accepts defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that Statement. As discussed below, however, plaintiff's admission of the facts set forth in defendants' 7.1(a)(3) Statement which center primarily on plaintiff's visit to Dr. LaDolce in May 2001, are not dispositive of the present motion. *See DeRienzo v. Met. Transp. Auth., Metro North Commuter R.R.* 237 Fed.Appx. 642, 644 (2d Cir. 2007) (fact that plaintiff failed to comply with Local Rule 56.1 "does not absolve the party seeking summary judgment of th[is] burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 Statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001)).

C.       Relevant Legal Standard

FELA provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. When Congress enacted FELA in 1908, its "attention was focused primarily upon injuries and death resulting from accidents on interstate railroads." *Urie v. Thompson*, 337 U.S. 163, 181 (1949). Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the "human overhead" of doing business from employees to their employers. *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 58 (1943); *see also Wilkerson v. McCarthy*, 336 U.S. 53, 68 (1949) (Douglas, J., concurring) (FELA "was designed to put on the

6

railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations").  In order to further FELA's humanitarian purposes, Congress "did away with several common-law tort defenses that had effectively barred recovery by injured workers." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994).  "Specifically, the statute abolished the fellow servant rule, rejected the doctrine of contributory negligence in favor of that of comparative negligence, and prohibited employers from exempting themselves from FELA through contract; a 1939 amendment abolished the assumption of risk defense."  *Id.* at 542-43 (citing 45 U.S.C. §§ 51, 53-55).

The Supreme Court has "liberally construed" FELA to further Congress' remedial goal. *Id.*  For example, the Court held in *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506 (1957), that "a relaxed standard of causation applies under FELA."  To wit, the Court stated that "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  *Id.*  "That FELA is to be liberally construed, however, does not mean that it is a workers' compensation statute."  *Gottshall,* 512 U.S. at 543.  The Supreme Court has "insisted that FELA 'does not make the employer the insurer of the safety of his employees while they are on duty.  The basis of his liability is his negligence, not the fact that injuries occur.'"  *Id.* (quoting *Ellis v. Union Pacific R. Co.*, 329 U.S. 649, 653 (1947)).  And while "[w]hat constitutes negligence for the statute's purposes is a federal question," *Urie*, 337 U.S. at 174, the Supreme Court has "made clear that this federal question generally turns on principles of common law."  *Gottshall*, 512 U.S. at 543.

"A railroad may be liable under FELA for failure to provide a safe workplace 'when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care

7

to inform and protect its employees.' " *Id.* at 826 (quoting *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 84-85 (2d Cir. 1989)).  Significantly, the essential element of reasonable foreseeability in FELA actions, requires proof of actual or constructive notice to the employer of the defective condition that caused the injury.  *See Gallose,* 878 F.2d at 85 ("The catalyst which ignites [the duty to provide a safe workplace] is knowledge, either actual or constructive.") (citing *Gallick*, 372 U.S. at 117).  Under FELA, "the case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff."  *Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 828 (2d Cir. 1994) (citing *Gallick v. Baltimore and O.R.R.*, 372 U.S. 108, 120-21 (1963)).  However, while FELA plaintiffs are entitled to have reasonable inferences drawn in their favor from the facts, they may not survive a motion for summary judgment when the inferences they ask a court to draw are mere possibilities.  *See Connors v. Consol. Rail Corp.*, No. 90-CV-464, 1993 WL 169646, at *8 (N.D.N.Y. May 19, 1993) (citing *Gibson v. American Broadcasting Cos. Inc.*, 892 F.2d 1128, 1132 (2d Cir. 1989)).

D.      Timeliness of Plaintiff's Claims

FELA provides that "[n]o action shall be maintained ... unless commenced within three years from the day the cause of action accrued." 15 U .S.C. § 56.  With respect to "gradual injuries"- those which occur over long periods of time, due to ongoing exposure to harmful working conditions - the Supreme Court has adopted a "discovery rule" and held that the FELA statute of limitations accrues when the injury "manifest [s]" itself, taking into account whether the plaintiff "should have known" of his injury.  *Urie*, 337 U.S. at 170  (when "no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time; consequently the afflicted employee can be held to be 'injured' only when the accumulated

8

effects of the deleterious substance manifest themselves."). Thus, a FELA action accrues when "the plaintiff in the exercise of reasonable diligence knows both the existence and the cause of his injury." *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1080 (2d Cir. 1988) (citing *United States v. Kubrick*, 444 U.S. 111, 122-25 (1979)).

Plaintiff commenced the instant action by filing it on December 30, 2004; therefore, if he knew or should have known of his injuries and their alleged work related cause prior to December 30, 2001, his claims are untimely. In support of their argument that plaintiff had knowledge of both the fact and cause of his injuries outside of the statute of limitations period, defendants point to the note from Dr. LaDolce dated May 4, 2001. Defendants also argue that plaintiff's deposition testimony reveals that he knew when he saw Dr. LaDolce in May 2001, that the pain in his hands and knees was work-related. Indeed, plaintiff testified in November 2006, that though he could not remember going to see Dr. LaDolce in May 2001, "[he] could have possibly gone and seen him because [his] hands and knees hurt." Further, in response to the question of whether he was having pain in his hands and knees in May 2001, plaintiff testified "[l]ike I said to you, I don't even remember going to [Dr. LaDolce.] But the possibility that -- if that's what it says, I'm sure I did; yes." The only other evidence in the record concerning the history of plaintiff's hand and knee pain comes from the radiology report concerning radiographic images of plaintiff's hands and knees taken on May 4, 2001, and the history relayed by Dr. Mtanos in his April 2005 note.

After reviewing the entire record, the Court concludes that there is no doubt plaintiff was experiencing painful symptoms in his both his hands and knees prior to December 30, 2001, and that he relayed these symptoms to a physician. Moreover, it is also true that plaintiff relayed that he experienced painful symptoms in his hands and knees in the context of his work on the

9

railroad. Consequently, even if, as plaintiff contends, no doctor informed him that his symptoms were related to his work as a welder, it is clear from the record that plaintiff, a man who had worked on the railroad doing heavy duty manual labor for more than two decades, and had filed work-related injury claims before, either knew his symptoms were caused and/or aggravated by his work or should have known of the work-related cause of his pain.

Nevertheless, the Court is not persuaded that the record herein is devoid of triable questions concerning plaintiff's knowledge that he in fact had permanent cognizable injuries to his hands and knees prior to December 2001. Indeed, because this case involves a claim of "gradual injury" to plaintiff's hands and knees, the manifestation of symptoms due to work activities alone is insufficient to place plaintiff on notice of both the existence of a permanent injury and its alleged work-related cause. *See Mix v. Delaware and Hudson Ry. Co.*, 345 F. 3d 82, 91 (2d Cir. 2003) ("[A] plaintiff may maintain a claim for "accumulation" if he proffers evidence suggesting that his initial symptoms were temporary in nature, and based upon their accumulation, became permanent injuries only during the three-year period preceding his suit.) Indeed, the Second Circuit explicitly recognized in *Mix* that "temporary injuries may be sufficiently distinct from permanent injuries to preclude summary judgment, as an employee is 'injured only when the **accumulated** effects of the [continuing exposure] manifest themselves.'" *Id.* (quoting *Urie,* 337 U.S. at 170 (emphasis added)).

Here, the Court may reasonably infer from facts in the record that although plaintiff was experiencing work-related **pain** in his hands and knees before December 2001, he did not necessarily know he had nor was he actively seeking medical treatment for a discreet or identifiable **injury** at that time. To wit, his visit to Dr. LaDolce, a primary care physician, in May 2001, was for a complete physical examination, not for treatment of pain in his hands and knees.

10

True, plaintiff mentioned the painful symptoms he was having in his hands and knees to Dr. LaDolce, but he also expressed concern over sexual dysfunction he was experiencing and having his prostrate checked.  It is clear that plaintiff's visit to Dr. LaDolce in May 2001 was for the express purpose of assessing his state of overall health as evidenced by Dr. LaDolce's concluding notes wherein he said he discussed a "low fat diet" and "20 lb. weight reduction" with plaintiff.  Dr. LaDolce also advised plaintiff to "stay active in terms of his hands," make arrangements for a colonoscopy and have an annual chest x-ray due to his history of asbestos exposure.  Dr. LaDolce asked plaintiff to return in two months for a full assessment of his blood work and cholesterol levels.  Finally, although Dr. LaDolce referred plaintiff for x-rays of his hands and knees, he also requested plaintiff undergo a chest x-ray at the same time.

     Dr. LaDolce did not refer plaintiff to an orthopedic doctor or rheumotologist for evaluation of his hand or knee pain.  There is no indication in the record that plaintiff sought any medical treatment for knee pain from May 2001 until September 2003 when he first saw Dr. Axelrod.  There are no medical records in evidence which show plaintiff was treated by any doctor for pain in his hands from May 2001 until April 2005 when he was examined by Dr. Mtanos.  Indeed, there is no indication in Dr. LaDolce's note on May 4, 2001, that plaintiff reported that the pain he was experiencing in his hands and knees was interfering with either the function of his joints or his ability work or engage in leisure activities.  Importantly, Dr. LaDolce did not note the nature, quality or frequency of the pain plaintiff complained about and there was no mention of plaintiff's hand and knee symptoms in the follow up note from plaintiff's July 12, 2001, visit.  Dr. LaDolce simply noted plaintiff's acknowledgment that the pain was "secondary" to his work at the railroad.  Dr. LaDolce's notes stand in stark contrast to the April 2005 note of Dr. Mtanos who described the "progressive" nature and "worse[ning]" of plaintiff's hand

11

symptoms in the "last three years" to the point where the pain had become "constant."

In this case, defendants have presented evidence that plaintiff undoubtedly experienced work-related symptoms in his hands and knees prior to the statute of limitations period for his present claims. This is clear from his deposition testimony wherein he admitted "having pain in his hands and knees." However, the Second Circuit has explicitly recognized that when injuries are claimed to be gradual or cumulative, as evidenced by chronic but intermittent pain outside the statute of limitations period, the change from "temporary to permanent pain" is a "distinct injury" and is timely for the purpose of FELA if filed within three years. *See Mix v. Delaware and Hudson Ry. Co.*, 164 Fed.Appx. 168, 169 (2d Cir. 2006) (citing *Fonseca v. Consol. Rail Corp.*, 246 F. 3d 585, 587 (6th Cir. 2001)). The Court finds that plaintiff could argue reasonably on this record that did not discover or realize he had a definite or permanent injury to his hands and knees until sometime after seeing Dr. LaDolce in May 2001. Given the nature of plaintiff's claimed knee and hand injuries and the relatively short time frame between his visit to Dr. LaDolce, which is outside the statute of limitations period, and December 30, 2001, at which time the limitations period began to run, it is inconceivable that plaintiff suffered either a "distinct injury" during the three year period preceding the filing of his claim or that a "distinct act" of negligence aggravated a pre-existing injury. *See Mix*, 345 F. 3d at 91 ("Mix can survive summary judgment if he proffers evidence [on remand] that, prior to June 28, 1997, his tinnitus and hearing loss caused only temporary discomfort as a result of his exposure to noisy working conditions, and that these symptoms did not manifest themselves as a cumulative, permanent injury until the three-year period preceding this action.").

E.   Claim Preclusion

Defendants argue that plaintiff is precluded from pursuing his present claim for

degenerative joint disease ("DJD") in his hands based on his execution of a previous settlement and release of all claims in connection with bilateral carpal tunnel syndrome. In support of their contention that plaintiff's claim for DJD is not "new and distinct" from his prior bilateral carpal tunnel injury, defendants point to plaintiff's deposition testimony wherein he acknowledged that he continued to experience pain in his hands following the carpal tunnel release surgeries. However, defendants have not submitted an affidavit of an expert who has examined plaintiff's medical records and concluded that there is any connection between the previous injury of carpal tunnel and the present claim for DJD. Without any medical evidence or records demonstrating that the injuries are factually or medically indistinct, the Court cannot make a legal determination that the 1998 release is even relevant in this case.

## IV.    CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the motion for summary judgment filed by defendants is DENIED.

IT IS SO ORDERED.

Date: August 8, 2008

_____
Norman A. Mordue
Chief United States District Court Judge