UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HAROLD E. CAMPBELL, JR.,

                          Plaintiff,

v.                                                    1:05-CV-1501
                                                      (GTS/GJD)
CONSOLIDATED RAIL CORP.; and
CSX TRANSPORTATION, INC.,

                          Defendants.
_____

APPEARANCES:                              OF COUNSEL:

HANNON & PALERMO, P.C.                     DON P. PALERMO, ESQ.
   Counsel for Plaintiff                   GREGORY JOHN HANNON, ESQ.
150 South Independence Mall West
Philadelphia, PA  19106

FLINT & GRANICH                            JOSEPH A. GRANICH, ESQ.
   Counsel for Plaintiff
80 Wolf Road, 6th Floor
Albany, NY  12205

HODGSON RUSS LLP                           NOREEN D. GRIMMICK, ESQ.
   Counsel for Defendants                  LAWRENCE R. BAILEY, JR., ESQ.
60 East 42nd Street, 37th Floor
New York, NY  10165

BURNS, WHITE & HICKTON, LLC                ANDREW M. SMALLEY, ESQ.
   Counsel for Defendants                  T.H. LYDA, ESQ.
106 Isabella Street
Four Northshore Center
Pittsburgh, PA  15212

GLENN T. SUDDABY, United States District Judge

**<u>DECISION and ORDER</u>**

Plaintiff commenced this action on December 28, 2004, pursuant to the Federal

Employer's Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*  (*See* Dkt. No. 1, ¶ 4 [Plf.'s Compl.].)

Generally, Plaintiff alleges that, while working as a welder during his employment with

Defendant railroad companies from September 1976 to June 2005, he was exposed to "excessive

and harmful cumulative trauma to his hands."  (*See* Dkt. No. 24, ¶ 8 [Plf.'s Am. Compl.].)

Plaintiff also alleges that these "injuries were caused in whole or in part by the negligence,

carelessness and recklessness of the Defendants and their agents, servants, workmen and/or

employees, acting within the scope of their employment."  (*Id.* at ¶ 12.)

On or about May 15, 2007, Plaintiff's proffered ergonomics expert, Dr. Robert O. Andres,

prepared an expert report offering fourteen (14) "conclusions" and/or "opinions," which are

listed below in Part III of this Decision and Order.  (Dkt. No. 76, Part 2.)  Currently before the

Court is Defendants' motion *in limine,* filed on December 15, 2008, seeking to preclude the

testimony of Dr. Andres, with regard to each of the referenced fourteen (14) "conclusions"

and/or "opinions."  (Dkt. No. 76.)  On December 22, 2008, Plaintiff filed an opposition to

Defendants' motion.  (Dkt. No. 86.)  On December 29, 2008, Defendants filed a reply.  (Dkt. No.

95.)  On December 31, 2008, Plaintiff filed two sur-replies.  (Dkt. Nos. 103, 105.)  On January 5,

2009, the Court conducted a hearing in order to determine (1) whether Dr. Andres is qualified to

render his proffered conclusions / opinions, (2) whether the substance of the testimony is

reliable, and (3) whether the substance of the testimony is relevant.  For the reasons set forth

below, Defendants' motion *in limine* is granted in part and denied in part.

2

# I.      GENERAL LEGAL STANDARD

Generally, in order to permit a challenged expert to testify, the Court must conclude that (1) the expert is qualified to render his proffered opinions, (2) the substance of the proffered testimony is reliable, and (3) the substance of the proffered testimony is relevant and not unfairly prejudicial.  *See* Fed. R. Evid. 104(a), 401, 403, 702, 703; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The proponent of the expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.  *See* Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments; *Topliff v. Wal-Mart Stores East LP*, 04-CV-0297, 2007 WL 911891, at *3 & n.5 (N.D.N.Y. Mar. 22, 2007) (Lowe, M.J.) [citations omitted]. It is true that, generally, such a proponent is aided by the presumption of admissibility of evidence.  *Topliff*, 2007 WL 911891, at *3 & n.6 [citations omitted].  However, even this presumption will not rescue a proponent who has failed to adduce sufficient evidence in support of his position.  *Id.* at *3 & n.7 [collecting cases].  Finally, it should be noted that "the standards for determining the reliability and credibility of expert testimony are not altered [in FELA cases] merely because the burden of proof is relaxed."  *Higgins v. Consol. Rail Corp.*, 06-CV-0689, 2008 WL 5054224, at *2 (N.D.N.Y. Nov. 21, 2008) (Sharpe, J.) [citation omitted].

# II.     ANALYSIS

## A.      Whether Dr. Andres Is Qualified to Render His Proffered Opinions

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir.2004) [citation omitted].  "In

assessing whether a proposed expert is 'qualified,' the trial judge should remember the 'liberal[ ] purpose' of Rule 702, and remain 'flexibl[e]' in evaluating the proposed expert's qualifications." *Topliff*, 2007 WL 911891, at *3 & n.8 [citations omitted]. "As long as some reasonable indication of qualification is adduced, the court may admit the evidence without abdicating its gate-keeping function." *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999).

Here, Plaintiff has provided Dr. Andres' educational background and professional experience in some detail. (Dkt. No. 76, Part 3.) In addition, Defendants appear to concede that Dr. Andres is qualified as an expert in ergonomics, focusing only on the reliability and relevance of his proffered testimony. (Dkt. No. 76, Part 4, at 2, 6.) The Court notes that it appears that every other federal district court that has addressed the issue has found Dr. Andres to be so qualified. *See Lindquist v. Union Pacific R. Co.*, 07-CV-0027, Memorandum Opinion, at 4 (E.D. Tex. filed Oct. 8, 2008); *Wilcox v. CSX Transp., Inc.*, 05-CV-0107, 2007 WL 1576708, at *15 (N.D. Ind. May 30, 2007); *Williams v. CSX Transp., Inc.*, 03-CV-0348, 2005 U.S. Dist. LEXIS 46024, at *8-16 (N.D. Ind. Aug. 23, 2005); *Thomas v. Reading, Blue Mountain and N. R.R. Co.*, 01-CV-5834, 2003 WL 21949156, at *5-6 (E.D. Pa. Aug. 14, 2003)*; Tapia v. S. Pac. Transp., Inc.*, 97-CV-1463, Memorandum Opinion and Order, at 8-10 (D. N.M. Sept. 3, 1999); *Aparicio v. Norfolk & Western Ry. Co.*, 93-CV-7261, 1997 U.S. Dist. LEXIS 22886, at *5-6 (N.D. Oh. Aug. 4, 1997); *cf. Pretter v. Metro N. Commuter R.R. Co.*, 206 F. Supp. 2d 601, 602-05 (S.D.N.Y. 2002) (focusing exclusively on the reliability and relevance of Dr. Andres' proffered testimony, and noting that Dr. Andres does possess at least some "areas of . . . expertise").

For these reasons, the Court finds that Dr. Andres is qualified as an expert in ergonomics.

**B.** **Whether Dr. Andres' Testimony Is Reliable**

4

The reliability requirement mentioned above in Part I of this Decision and Order derives

from Fed. R. Evid. 702, which provides, in pertinent part, as follows:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert ... may testify ... in the form of opinion
> or otherwise, if *(1) the testimony is based upon sufficient facts or data,*
> *(2) the testimony is the product of reliable principles and methods, and*
> *(3) the witness has applied the principles and methods to the facts of*
> *the case*.

Fed. R. Evid. 702 [emphasis added].  As a result, an analysis of whether proffered testimony

meets the reliability requirement is generally viewed as involving three inquiries: (1) whether the

testimony is based on sufficient facts or data; (2) whether the testimony is the product of reliable

principles and methods; and (3) whether the witness has applied the principles and methods

reliably to the facts of the case.

### 1.        Whether the Testimony is Based on Sufficient Facts and Data

The first inquiry made in assessing the reliability requirement has to do with sufficiency,

specifically, whether the expert's testimony is grounded on sufficient facts and data.  This

consideration is quantitative rather than qualitative in nature.  *See* Fed. R. Evid. 702, Advisory

Committee Notes: 2000 Amendments.  The term "facts and data" is intended to be broad enough

to include (1) the reliable opinions of other experts, and (2) hypothetical facts supported by the

evidence.  *Id*.

Here, the Court finds that some of Dr. Andres' conclusions and opinions are based on

sufficient facts and data.  For example, Dr. Andres states that, in preparing his report, he

reviewed the following materials: (1) pleadings and deposition testimony in this action (and

other actions); (2) medical records of Plaintiff's treating physician; (3) publications on safety,

ergonomics or other subjects by the Federal Railroad Administration ("FRA") and the American

Association of Railroads ("AAR"); (4) Defendant CSX's description of Plaintiff's job as a

welder, and videos of other welders working; (5) Defendant Conrail's other videos and

documents; and (6) articles on work-related musculoskeletal disorders, and textbooks on

ergonomic risk factors.  (*See*, *e.g.*, Dkt. No. 76, Part 2, at 3-6 [attaching pages "2" to "5" of Dr.

Andres' Report].)

  As a result, there are sufficient facts and data supporting his conclusions and opinions

that performing certain jobs (e.g., welding, etc.) generally exposes workers (and generally

exposed Plaintiff) to certain ergonomic risk factors, which generally have been associated with

certain cumulative trauma disorders to the upper extremity.  (*See generally* Dkt. No. 76, Part 2.)

*See also Lovato v. Burlington N. and Sante Fe R.R. Co.*, 00-CV-2584, 2002 WL 1424599, at *7

(D. Colo. June 24, 2002) (permitting expert to testify that the plaintiff, in the course of his

normal daily activities as a carman, was routinely and regularly exposed to ergonomic risk

factors, which generally have been associated with the development of significant injuries to the

forearms, elbows, neck and shoulders).

  However, several of Dr. Andres' conclusions and opinions are not based on sufficient

facts and data.  For example, Dr. Andres attempts to draw certain conclusions, or form certain

opinions, based on the "exposure" that Plaintiff experienced to various ergonomic risk factors

without expressly basing those conclusions and opinions on scientific tests or objective

measurements, such as measurements of (1) the durations and frequency of each of the types of

exposures in question, (2) the frequency of specific movements made by Plaintiff, (3) the levels

of force used during those movements, (4) the extent of vibration experienced by Plaintiff during

6

specific tasks, (5) the rest periods in between tasks, (6) the extent of stress to Plaintiff's hands, and/or (7) the air temperature.  (*Id*.)  The omission of such measurements is conspicuous since Dr. Andres testified, at the *Daubert* hearing, that it was generally possible to measure such things as (1) the different angles involved in various postures, (2) the levels of vibration from using various tools (e.g., "grinders," etc.), and (3) the amount of repetition involved in various jobs. Rather, Dr. Andres generally bases these conclusions and opinions on the following: (1) a comparison of Plaintiff's description of his own work to a visual inspection of work performed by other persons at other work sites (which are mostly operated by other railroad companies); (2) a weighing of tools similar to those presumably used by Plaintiff; and (3) a checking of boxes on an ergonomic checklist for the presence of "force exerted," "awkward postures," and "vibration." (*Id*; *see also Daubert* Hearing Testimony.)  Several federal courts have been critical of drawing certain conclusions, or forming certain opinions, on such "facts and data."  *See*, *infra*, note 1 of this Decision and Order (citing cases).

For these reasons, the Court finds that, while some of Dr. Andres' conclusion and opinions are based on sufficient facts and data, others–which are described in more detail below in Part III of this Decision and Order–are not based on sufficient facts and data.

> **2.** **Whether Dr. Andres' Testimony Is the Product of Reliable Principles and Methods, and Whether He Has Applied the Principles and Methods Reliably to the Facts of the Case**

The second and third inquiries made in assessing the reliability requirement are qualitative in nature, requiring that the principles and methods be both reliable in and of themselves and reliably applied to the facts of the case.  Courts have considered various factors as indicators of whether these two requirements have been satisfied.  The Supreme Court has

stated that, in considering the applicable factors, a court's ultimate objective is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 151.

Generally, these factors include the following: (1) whether the expert's technique or theory can be, or has been, tested-that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; (5) whether the technique or theory has been generally accepted in the scientific community; (6) whether the expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying; (7) whether the expert has unjustly extrapolated from an accepted premise to an unfounded conclusion; and (8) whether the expect has adequately accounted for obvious alternative explanations for the plaintiff's condition. *See Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 593-94 (1993) [citations omitted]; *Topliff* , 2007 WL 911891, at *13-14 & nn. 89-93 [citations omitted]; Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.

Here, the Court finds that some of Dr. Andres' testimony is the product of a reliable application of reliable principles and methods, e.g., his testimony that performing the jobs that Plaintiff performed generally exposes workers (and generally exposed Plaintiff) to certain

ergonomic risk factors, which generally have been associated with certain cumulative trauma disorders to the upper extremity.  (*See generally* Dkt. No. 76, Part 2.)  *See Lovato*, 2002 WL 1424599, at *7 (D. Colo. June 24, 2002) (permitting expert to testify that the plaintiff, in the course of his normal daily activities as a carman, was routinely and regularly exposed to ergonomic risk factors, which generally have been associated with the development of significant injuries to the forearms, elbows, neck and shoulders).

However, some of Dr. Andres' testimony is not the product of a reliable application of reliable principles and methods.  For example, any conclusion or opinion offered by Dr. Andres (whether explicitly or implicitly) that Plaintiff's jobs, work conditions or training *caused* his cumulative trauma disorder is unreliable for a number of reasons, including the following: (1) the fact that such a theory is not the result of testing by Dr. Andres but rather is simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) the fact that there is no known or potential rate of error of the analytical technique used by Dr. Andres; and (3) the fact that Dr. Andres has not adequately accounted for obvious alternative explanations for Plaintiff's condition (such as medical histories and non-work activities).  *See Magdaleno v. Burlington N. R.R. Co.*, 5 F. Supp.2d 899, 902-04 (D. Colo. 1998) (precluding expert from testifying that the plaintiff's working conditions caused the cumulative trauma disorder to his wrists and hands, because, *inter alia*, he failed to consider non-occupational factors, such as medical histories and non-work activities, as the cause of the plaintiff's injuries); *Lovato*, 2002 WL 1424599, at *7-8 (precluding expert from testifying that risk factors present in plaintiff's work were sufficient to cause, or did cause, plaintiff's injuries, because of, *inter alia*, lack of testing).

For these reasons, the Court finds that, while some of Dr. Andres' conclusions and opinions are the product of a reliable application of reliable principles and methods, others–which are described in more detail below in Part III of this Decision and Order–are not the product of a reliable application of reliable principles and methods.

### C.    Whether Dr. Andres' Testimony Is Relevant and Not Unfairly Prejudicial

The Federal Rules of Evidence provide that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. The Federal Rules of Evidence further provide that "[a]ll relevant evidence is admissible, except as otherwise provided by . . . these rules."  Fed. R. Evid. 402.  One of the rules that excludes relevant evidence under certain circumstances is Fed. R. Evid. 403, which provides as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of  unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  Given that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it . . ., the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. 595 [internal quotation marks and citation omitted].

Here, some of Dr. Andres' testimony (i.e., the testimony described with approval in Parts II.B.1. and II.B.2. of this Decision and Order) would be relevant and not unfairly prejudicial. However, some of his testimony would be unfairly prejudicial.  For example, any probative value from Dr. Andres' testimony that Defendants "should have" conducted or implemented

certain evaluations, training or programs would be substantially outweighed by the danger of

unfair prejudice, confusion of the issues or misleading the jury. *See Pretter v. Metro North*

*Commuter R.R. Co.*, 206 F. Supp.2d 601, 603-04 (S.D.N.Y. 2002) (precluding Dr. Andres from

using words "should have" since it was not a matter reducible to scientific certainty and was

calculated to confuse and mislead the jury).

For these reasons, the Court finds that, while some of Dr. Andres' conclusions and

opinions are relevant and not unfairly prejudicial, others–which are described in more detail

below in Part III of this Decision and Order–are unfairly prejudicial.


## III.    SPECIFIC RULINGS

Conclusion / Opinion 1: "Mr. Campbell has a medical history consistent with exposure to

ergonomic risk factors for the upper extremity."

This conclusion / opinion is precluded in part for four reasons: (1) the term "medical

history" is vague and refers to a subject outside Dr. Andres' area of expertise; (2) the term

"consistent with" implies a causal relationship without a scientific basis; (3) the asserted

"exposure" was not objectively measured by Dr. Andres with regard to the duration of each such

type of exposure, the frequency of such exposures, the frequency of movements, the levels of

force used, the rest periods in between, but was derived from a visual inspection of work

performed by other persons at another work site; and (4) the term "ergonomic risk factors" is not

defined with specificity.[1]

---

[1]     *See Pretter v. Metro North Commuter R.R. Co.*, 206 F. Supp.2d 601, 603-04
(S.D.N.Y. 2002) (precluding Dr. Andres from testifying that plaintiffs had a work history
consistent with exposure to ergonomic risk factors, because conclusion was vague and term

As a possible alternative, Dr. Andres may offer testimony consistent with the following (if appropriate): "Performing the job of welding generally exposes workers to certain ergonomic risk factors (i.e., [list factors]), which generally have been associated with (among other injuries and/or illnesses) cumulative trauma disorder to the upper extremity."

Conclusion / Opinion 2: "Mr. Campbell has been exposed to repetitive work using vibrating hand tools in several of his job tasks. This repetitive work was hand intensive, required forceful exertions, and required prolonged awkward postures of and mechanical stress concentrations to the upper extremity. Welding tasks also required sustained awkward postures of the knees, as well as lifting and carrying. Gloves were worn for most tasks, and some of his work was done in cold conditions."

---

"ergonomic risk factors" [1] was not defined with specificity, and [2] was not measured with objectivity as to frequency of movements or levels of force used, but rather was derived from visual inspection of work functions); *Lovato v. Burlington N. and Sante Fe R.R. Co.*, 00-CV-2584, 2002 WL 1424599, at *6-9 (D. Colo. June 24, 2002) (precluding expert from testifying that risk factors present in plaintiff's work were sufficient to cause, or did cause, plaintiff's injuries, because expert did not measure vibration or forces generated by tools that plaintiff used, did not know how much time plaintiff used the tools, and visited plaintiff's work site only once before reaching his conclusion); *Stasior v. Nat'l R.R. Passenger Corp.*, 19 F. Supp.2d 835, 849-51 (N.D. Ill. 1998) (precluding expert from testifying that the plaintiff's awkward posture and repetition at the railroad's workstation contributed to the plaintiff's carpal tunnel syndrome and chronic tendonitis, because expert did not test or quantify the degree of awkward posture and repetition which the plaintiff allegedly suffered); *Magdaleno v. Burlington N. R.R. Co.*, 5 F. Supp.2d 899, 902-04 (D. Colo. 1998) (precluding expert from testifying that the plaintiff's working conditions caused the cumulative trauma disorder to his wrists and hands, because he failed to [1] measure the plaintiff's body, [2] measure the duration, joint deviation, posture, or force exertion necessary to operate the specific tools used by the plaintiff, [3] measure temperature of the repair facility at which the plaintiff worked, [4] measure the recovery time permitted for company employees after their use of a specific tool, and [5] failed to consider non-occupational factors, such as medical histories and non-work activities, as the cause of the plaintiff's injuries).

This conclusion / opinion is generally permissible but is precluded in part for two reasons: (1) the asserted "exposure" was not objectively measured by Dr. Andres with regard to the duration of each such type of exposure, the frequency of such exposures, the frequency of movements, the levels of force used, the rest periods in between, the extent of vibration, the extent of stress to the hands, and the air temperature, but was derived from a visual inspection of work performed by other persons at another work site; and (2) the terms "knees," "lifting" and "carrying" are no longer relevant because the plaintiff has withdrawn his claim regarding his lower extremity.[2]

As an alternative, Dr. Andres may offer testimony consistent with the following (if appropriate): "Based on what I have learned and observed, including my knowledge of Mr. Campbell's work, it appears to me that, during the relevant time period, generally Mr. Campbell was exposed to repetitive work using vibrating hand tools in several of his job tasks.  This repetitive work was hand intensive, required forceful exertions, and required prolonged awkward postures of and mechanical stress concentrations to the upper extremity.  Gloves were worn for most tasks, and some of his work was done in cold conditions."

---

[2]      *See Pretter*, 206 F. Supp.2d at 603-04 (precluding Dr. Andres from testifying that the jobs performed by the plaintiffs exposed them to sufficient amount of documented ergonomic risk factors for the upper extremity to be consistent with the development of Carpal Tunnel Syndrome, because conclusion was vague, and the ergonomic risk factors were not measured with objectivity as to frequency of movements or levels of force used, but rather derived from visual inspection of work functions); *Baker v. Metro-North R.R. Co.*, 98-CV-1073, 2003 WL 22439730, at *2 (D. Conn. Oct. 23, 2003) (precluding expert from testifying because she failed to measure ergonomic risk factors, and did not ascertain rest period between the plaintiff's exposure to the risks); *Stasior*, 19 F. Supp.2d at 849-51 (precluding expert from testifying that the plaintiff's awkward posture and repetition at the railroad's workstation contributed to the plaintiff's carpal tunnel syndrome and chronic tendonitis, because expert did not test or quantify the degree of awkward posture and repetition which the plaintiff allegedly suffered); *cf. Lovato*, 2002 WL 1424599, at *6-7 (allowing expert to conclude that, in the course of the plaintiff's normal daily activities at work, he was routinely and regularly exposed to ergonomic risk factors because this conclusion stemmed from the expert's observations of the plaintiff at work).

Conclusion / Opinion 3: "Based on materials I have seen, Conrail/CSX did not perform an ergonomic screening or job analysis of many of the jobs that Mr. Campbell performed prior to his injuries or occupational illnesses."

This conclusion / opinion is precluded in part for four reasons: (1) Dr. Andres has no personal knowledge of what screening or analysis Defendants did or did not do; (2) the term "many of the jobs" is subjective and vague; (3) the term "prior to his injuries" is vague as to time, and implies causal relationship without scientific justification; and (4) Dr. Andres' assertion that the ergonomic screening or job analysis never occurred implies that it should have occurred (in fulfillment of a legal duty under FELA), which is a notion not reducible to scientific certainty, and which is calculated to confuse and mislead the jury.[3]

As possible alternatives, Dr. Andres may offer testimony consistent with the following (if appropriate): (1) "Generally, to mitigate the effects of certain ergonomic risk factors for cumulative trauma disorders to the upper extremity, it is recommended by [state whom (e.g., Occupational Safety and Health Administration ("OSHA"), the FRA, the AAR, and/or me in my expert opinion)] that a company perform the following ergonomic screening or job analysis: [describe]"; and (2) "Based on the materials I have seen, it appears to me that, during the relevant time period, Defendants generally did not perform such an ergonomic screening or job analysis for certain jobs in the following regard: [describe]."

Conclusion / Opinion 4: "Mr. Campbell never received ergonomic training concerning the upper or lower extremity beyond safety meetings or on the job.  He was not trained to

---

[3]      *See Pretter*, 206 F. Supp.2d at 603-04 (precluding Dr. Andres from testifying that none of the plaintiffs had ever received ergonomics training beyond safety meetings on the job, because of lack of personal knowledge); *Magdaleno*, 5 F. Supp.2d at 906 (precluding expert from testifying that defendants should conduct a detailed analysis of the workplace then institute changes, because testimony improperly opines on causation).

recognize upper or lower extremity ergonomic risk factors in his job or how to minimize their effect.  He was not trained to recognize early musculoskeletal disorders, nor was any step taken by management when he reported these symptoms at their onset."

This conclusion / opinion is precluded in part for four reasons: (1) Dr. Andres has no personal knowledge of what training Mr. Campbell did or did not receive; (2) the term "when he reported these symptoms at their onset" is vague as to time; (3) Dr. Andres has no personal knowledge of what steps Defendants did or did not take in response to any reported symptoms by Plaintiff; and (4) Dr. Andres' assertion that the ergonomic training in question never occurred implies that it should have occurred (in fulfillment of a legal duty under FELA), which is a notion not reducible to scientific certainty, and which is calculated to confuse and mislead the jury.[4]

As possible alternatives, Dr. Andres may offer testimony consistent with the following (if appropriate): (1) "Generally, to mitigate the effects of certain ergonomic risk factors for the upper extremity, it is recommended [state whom (e.g., OSHA, the FRA, the AAR, and/or me in my expert opinion)] that a company administer the following ergonomic training to its employees: [describe]"; and (2) "Based on the materials I have seen, it appears to me that, during the relevant time period, Defendants generally did not administer such ergonomic training in the following regard: [describe]."

Conclusion / Opinion 5: "Conrail/CSXT has not implemented any comprehensive plan to control the hazards of exposure to lower and upper extremity ergonomic risk factors for welders

---

[4]        *See Pretter*, 206 F. Supp.2d at 603-04 (precluding Dr. Andres from testifying that none of the plaintiffs had ever received ergonomics training beyond safety meetings on the job, because of lack of personal knowledge; and precluding Dr. Andres from using words "should have" since it was not a matter reducible to scientific certainty and was calculated to confuse and mislead the jury).

like Mr. Campbell."

This conclusion / opinion is precluded for four reasons: (1) Dr. Andres has no personal knowledge of what plan Defendant did or did not have; (2) Dr. Andres' assertion that Defendants did not implement the plan in question implies that they should have implemented such a plan (in fulfillment of a legal duty under FELA), which is a notion not reducible to scientific certainty, and which is calculated to confuse and mislead the jury; (3) the term "comprehensive" is vague and subjective; and (4) the term "lower extremity" is no longer relevant because Plaintiff has withdrawn his claim regarding his lower extremity.[5]

As possible alternatives, Dr. Andres may offer testimony consistent with the following (if appropriate): (1) "Generally, to mitigate the effects of certain ergonomic risk factors for cumulative trauma disorders to the upper extremity, it is recommended by [state whom (e.g., OSHA, the FRA, the AAR, and/or me in my expert opinion)] that a company implement the following plan to control the hazards of exposure to those ergonomic risk factors for welders: [describe]"; and (2) "Based on the materials I have seen, it appears to me that, during the relevant time period, Defendants generally did not implement such a plan in the following regard: [describe]."


Conclusion / Opinion 6: "Conrail/CSXT does not have a comprehensive ergonomics

---

[5]     *See Pretter* 206 F. Supp.2d at 603-04 (precluding Dr. Andres from testifying that the railroad failed to perform a job analysis of the jobs employees performed and that various departments did not effectively communicate with each other because of lack of personal knowledge); *Thomas v. Reading, Blue Mountain and N. R.R. Co.*, 01-CV-5834, 2003 WL 21949156, at *5 (E.D. Pa. Aug. 14, 2003) (precluding any conclusion or opinion that Conrail lacked a proper program and/or evaluation-process [e.g., "screening program," "training program," "hazard-control program," "ergonomics program," "worksite and job evaluations," etc.] unless Dr. Andres was able to indicate precisely what proper program and/or evaluation process would have been, and that he is certain that Conrail in fact did not have such program and/or evaluation process).

program consistent with published guidelines for the prevention of WMSDs [work-related

musculoskeletal disorders]."

This conclusion / opinion is precluded in part for six reasons: (1) Dr. Andres has no

personal knowledge of what program Defendant did or did not have; (2) his use of the present

tense renders his conclusion / opinion irrelevant in that the period of time at issue is before June

27, 2005, when Plaintiff ceased his employment with Defendants; (3) Dr. Andres' assertion that

Defendants did not have the program in question implies that they should have had such a

program (in fulfillment of a legal duty under FELA), which is a notion not reducible to scientific

certainty, and which is calculated to confuse and mislead the jury; (4) the term "comprehensive"

is vague and subjective; (5) the term "published guidelines" is vague; and (6) the term

"work-related musculoskeletal disorders" is too vague or broad since the only injuries or

illnesses that are relevant under the circumstances are those for a cumulative trauma disorders to

the upper extremity.[6]

As possible alternatives, Dr. Andres may offer testimony consistent with the following (if

appropriate): (1) "Generally, to prevent certain work-related musculoskeletal disorders to the

upper extremity, it is recommended by [state whom (e.g., OSHA, the FRA, the AAR, and/or me

in my expert opinion)] that a company have an ergonomics program consistent with the

following ergonomics-program guidelines that have been published (i.e., [describe guidelines

---

[6]     *See Pretter*, 206 F. Supp.2d at 603-04 (precluding Dr. Andres from using words "should have" since it was not a matter reducible to scientific certainty and was calculated to confuse and mislead the jury; and precluding Dr. Andres from testifying that the railroad did not provide certain training, or have a certain program, because of lack of personal knowledge); *Thomas*, 2003 WL 21949156, at *5 (precluding any conclusion or opinion that Conrail lacked a proper program and/or evaluation-process [e.g., "screening program," "training program," "hazard-control program," "ergonomics program," "worksite and job evaluations," etc.] unless Dr. Andres was able to indicate precisely what proper program and/or evaluation process would have been, and that he is certain that Conrail in fact did not have such program and/or evaluation process).

and specify by whom published])"; and (2) "Based on the materials I have seen, it appears to me that, during the relevant time period, Defendants generally did not have such a program in the following regard: [describe]."

Conclusion / Opinion 7: "Mr. Campbell was exposed to documented ergonomic risk factors for the upper extremity.  These risk factors included forceful gripping, segmental vibration, and awkward postures.  This type of exposure has been associated with the development of CTS and osteoarthritis."

This conclusion / opinion is precluded in part for the following reason: the asserted "exposure" and "ergonomic risk factors" were not objectively measured by Dr. Andres with regard to the duration of each such type of exposure, the frequency of such exposures, the frequency of movements, the levels of force used, the rest periods in between, the extent of vibration, or the extent of stress to the hands, but was derived from a visual inspection of work performed by other persons at another work site.[7]

As a possible alternative, Dr. Andres may offer testimony consistent with the following (if appropriate): "Based on what I have learned and observed, including my knowledge of Mr. Campbell's work, it appears to me that, during the relevant time period, generally Mr. Campbell was exposed to documented ergonomic risk factors for the upper extremity.  These risk factors included forceful gripping, segmental vibration, and awkward postures.  Generally, this type of exposure has been associated with the development of Carpal Tunnel Syndrome and osteoarthritis."

Conclusion / Opinion 8: "Mr. Campbell was exposed to documented ergonomic risk

---

[7]        *See, supra,* note 2 (citing *Lovato* case); *Magdaleno*, 5 F. Supp.2d at 906 (permitting expert to testify that four risk factors contribute to cumulative trauma disorders because ample support exists in the scientific community to reach this conclusion).

factors for the lower extremity.  These risk factors included lifting, carrying, squatting, kneeling, and walking on uneven surfaces."

This conclusion / opinion is precluded on grounds relevance and unfair prejudice because it deals only with lower extremity risk factors.  Plaintiff has withdrawn his claim regarding his lower extremity.

Conclusion / Opinion 9: "Exposure to lifting, carrying, squatting, kneeling, and walking on uneven surfaces has been associated with accelerated joint degeneration and the development of knee osteoarthritis."

This conclusion / opinion is precluded on grounds relevance and unfair prejudice because it deals only with lower extremity risk factors.  Plaintiff has withdrawn his claim regarding his lower extremity.

Conclusion / Opinion 10: "Walking on main line ballast created greater stresses within the lower extremities of Mr. Campbell than walking on walkway ballast of flat level surfaces."

This conclusion / opinion is precluded on grounds relevance and unfair prejudice because it deals only with lower extremity risk factors.  Plaintiff has withdrawn his claim regarding his lower extremity.

Conclusion / Opinion 11: "Conrail/CSXT should have but did not perform comprehensive worksite and job evaluations for ergonomic risk factors to which welders like Mr. Campbell were exposed.  If such analyses had been completed, or if Conrail/CSXT had heeded previous research, Conrail/CSXT would have known that some of these job tasks increased the risk of WMSDs for workers such as Mr. Campbell and systematic control strategies should have been implemented."

This conclusion / opinion is precluded in part for six reasons: (1) the term "should have . . . perform[ed] . . . evaluations" implies that Defendants had a legal duty to Plaintiff under

19

FELA to perform such evaluations, which is not a matter reducible to scientific certainty, and which is calculated to confuse and mislead the jury; (2) Dr. Andres has no personal knowledge of what evaluations Defendant did or did not perform; (3) the referenced "exposure" was not objectively measured by Dr. Andres with regard to the duration of each such type of exposure, the frequency of such exposures, the frequency of movements, the levels of force used, the rest periods in between, but was derived from a visual inspection of work performed by other persons at another work site; (4) the term "comprehensive" is vague and subjective; (5) the term "previous research" is vague; and (6) the assertion is speculative in nature as to whether performing worksite and job evaluations would have impacted Mr. Campbell, and what Defendant "would have known" had it "heeded" previous research.[8]

As possible alternatives, Dr. Andres may offer testimony consistent with the following (if appropriate): (1) "Generally, the association between certain ergonomic risk factors (i.e., [define]) and cumulative trauma disorders to the upper extremity is known in American industry due to having been widely published in the following trade and scientific journals: [specify]"; (2) "Generally, to mitigate the effects of certain ergonomic risk factors for the upper extremity to which welders are exposed, it is recommended by [state whom (e.g., OSHA, the FRA, the AAR, and/or me in my expert opinion)] that a company perform the following worksite and job evaluations for those ergonomic risk factors: ([describe evaluations])"; and (3) "Based on the materials I have seen, it appears to me that, during the relevant time period, Defendants generally did not perform such evaluations in the following regard: [describe]."

Conclusion / Opinion 12: "Conrail/CSXT should have but did not provide adequate training to Mr. Campbell to empower him to minimize exposure to upper and lower extremity

---

[8]        *See, supra,* note 6 (citing *Pretter* case).

ergonomic risk factors and to recognize early signs and symptoms of upper and lower extremity

musculoskeletal disorders."

This conclusion / opinion is precluded in part for four reasons: (1) the term "should have

. . . provide[d] . . . training" implies that Defendants had a legal duty to Plaintiff under FELA to

provide such training, which is not a matter reducible to scientific certainty, and which is

calculated to confuse and mislead the jury; (2) Dr. Andres has no personal knowledge of what

training Defendants did or did not provide Plaintiff; (3) the term "lower extremity" is no longer

relevant because Plaintiff has withdrawn his claim regarding his lower extremity; and (4) the

terms "adequate training," "minimize," and "early" are vague and subjective.[9]

As possible alternatives, Dr. Andres may offer testimony consistent with the following (if

appropriate): (1) "Generally, to mitigate the effects of certain ergonomic risk factors to the upper

extremity, it is recommended by [state whom (e.g., OSHA, the FRA, the AAR, and/or me in my

expert opinion)] that a company provide the following training to its employees to enable them

to recognize the signs and symptoms of a cumulative trauma disorder to the upper extremity:

[describe training]"; and (2) "Based on the materials I have seen, it appears to me that, during the

relevant time period, Defendants generally did not provide such training in the following regard:

[describe]."

Conclusion / Opinion 13: "Conrail/CSXT should have but did not implement a medical

management program, including early reporting of muscoloskeletal disorders of a non-traumatic

origin, conservative return to work, and medical monitoring, to treat and control lower and upper

extremity work related muscoloskeletal disorders."

This conclusion / opinion is precluded in part for four reasons: (1) the term "should have

---

[9]      *See, supra,* note 6 (citing cases).

. . . implement[ed] a medical monitoring program" implies that Defendants had a legal duty to Plaintiff under FELA to implement such a program, which is not a matter reducible to scientific certainty, and which is calculated to confuse and mislead the jury; (2) Dr. Andres has no personal knowledge of what program Defendants did or did not implement; (3) the term "early" is vague and subjective; and (4) the term "lower extremity" is no longer relevant because Plaintiff has withdrawn his claim regarding his lower extremity.[10]

As possible alternatives, Dr. Andres may offer testimony consistent with the following (if appropriate): (1) "Generally, to treat and control certain upper-extremity work-related muscoloskeletal disorders of a non-traumatic origin, it is recommended by [state whom (e.g., OSHA, the FRA, the AAR, and/or me in my expert opinion)] that a company implement the following medical management program: [describe]"; and (2) "Based on the materials I have seen, it appears to me that, during the relevant time period, Defendants generally did not implement such a program in the following regard: [describe]."

Conclusion / Opinion 14: "Conrail/CSXT did not have a comprehensive ergonomic program that a reasonable employer should have had in place to protect Mr. Campbell."

This conclusion / opinion is precluded in part for four reasons: (1) Dr. Andres has no personal knowledge of what ergonomics program Defendants did or did not have; (2) the term "comprehensive" is vague and subjective; (3) whether or not Defendants acted as a "reasonable employer" is a finding of fact for the jury; and (4) the term "should have had in place [an ergonomics program]" implies that Defendants had a legal duty to Plaintiff under FELA to have such a program, which is not a matter reducible to scientific certainty, and which is calculated to

---

[10]         *See, supra,* note 6 (citing cases).

confuse and mislead the jury.[11]

As possible alternatives, Dr. Andres may offer testimony consistent with the following (if appropriate): (1) "Generally, to prevent cumulative trauma disorders to the upper extremity, it is recommended by [state whom (e.g., OSHA, the FRA, the AAR, and/or me in my expert opinion)] that a company have the following ergonomics program: [describe]"; and (2) "Based on the materials I have seen, it appears to me that, during the relevant time period, Defendants generally did not have such a program in the following regard: [describe]."

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion *in limine* to preclude the testimony of Plaintiff's ergonomics expert, Dr. Robert O. Andres, with regard to each of the fourteen (14) "conclusions" and/or "opinions" he offers in his expert report (Dkt. No. 76) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part, as described in Part III of this Decision and Order.

Dated: January 6, 2009
       Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

---

[11]    *See, supra,* note 6 (citing *Pretter* case).